Okay, thanks for bearing with us for that brief break. We're ready to proceed with the next case on the calendar. Okay, there there's Judge Corman. We're ready to proceed with the next case on the calendar, which is United States v. Gilton, and this time I think the government gets to go first. Thank you, Your Honor. Good morning again, and may it please the Court. Matthew Yellovich on behalf of the United States. I'd like to reserve five minutes for a rebuttal, and I will keep my eye on the clock. Okay. Barry Gilton was convicted of RICO conspiracy by a jury of his peers following a month-long trial. In discarding that verdict, the district court made two fundamental legal mistakes. First, it thought that the government had to prove that Gilton had become a member of the racketeering enterprise, CDP. And second, it thought that the government had to prove Gilton's intent with respect to a second racketeering act. But neither of these things is required by RICO conspiracy, and because these errors are at the heart of both the judgment of acquittal and the order for a new trial, this court should reverse with instructions to reinstate the jury's verdict. I'm happy to answer any questions the court may have, as I'm sure there are many given the last argument, but otherwise I will start with the membership error. The district court repeatedly emphasized that the central question it was answering after trial was, was Barry excerpts of record two, the district court concluded that the evidence of trial of Gilton's membership in CDP was so lacking in comparison to the evidence that contradicted it, that a new trial was necessary. But under this court's case law, membership in CDP was not a required element of the offense. That's United States versus Teal cited in the government's opening brief at 23. And therefore these, the judgment of acquittal and the order of a new trial should be reversed because they're based on a legal error. Notably, Gilton doesn't really defend that error. He just contends that the district court didn't really mean that membership was required, but was using it as a shorthand, uh, for, uh, entering into the conspiracy. Wouldn't it be DeNovo review? Like, do we need to worry about exactly what the district court said? On the judgment of acquittal? No, your honor. But as for the new trial order, yes, because an error of law does constitute an abuse of discretion. This is the court applying the wrong legal rule. Um, but, but as to the judgment of acquittal, um, the court can, uh, sidestep the district court's analysis and just apply the elements of Rico conspiracy. And it's the government's contention that a rational juror viewing the evidence in the light, most favorable to the government with all reasonable inferences drawn in the government's favor and all conflicts in the evidence resolved in the government's favor, uh, would, uh, could it could have concluded that Gilton intended to further facilitate the criminal endeavor. And what is your best evidence of that purpose? So I think it helps to look at, uh, three different categories of evidence, your honor. The first is the best. Um, so I think that there are events in the record prior to the murder that show, uh, Gilton's intent. And I would start with the armed robbery discussion. Uh, and that's an excerpt of record eight 43 to eight 47, where Gilton is overheard agreeing to purchase the fruits of an armed robbery that Charles heard a CEP member. I didn't understand there to be evidence that he knew that it was the fruits of a robbery rather than just that he was buying a chain. Is it clear that he knew? No, that's a correct. You're correct. Your honor. And you're reading of the record that it is not explicit, uh, in the record as to what the totality of the conversation was, whether Gilton was informed it was fruits of an armed robbery or whether he thought Charles had just had extra jewelry that he was wanting to sell. I think that that one doesn't seem very strong. So can you go on? What else is good? Well, well, I, I think just to pause on that one for a moment, your honor. Um, I think that this is someone who, again, viewing the evidence in the light, most favorable to the government. I think this is a conversation between two people about buying jewelry. Um, and, uh, he's in a prime position to know, given his long time, uh, association with the gang to know what the gang is engaged in. Um, but I would also point to, um, the 2011 video and, and that's excerpts of record, uh, four 43 to four 47. This is a professionally made music video. The lyrics were excluded at trial. So I'll just focus on what the, what the video shows, because I think that was important to, um, to allow the jury to infer things from, which is, can I ask you, I struggled to understand whether the video was shown or only still photos that we have in our record here were what were shown was the video played at trial. So the stills were admitted, but the video was not admitted. Um, is my understanding of the record, your honor. But I can't look at the stills. And that's what you're saying is all the jury saw is the stills that we have. I believe that's right, your honor. But, but let me confirm on rebuttal, uh, uh, that fact. Um, but this, but the stills show that, and there's testimony about the stills, of course, and about the video, which is, it was, um, that it involved, uh, uh, uh, uh, uh, if you could pause the clock, please, we're going to need to, I lost, sorry, we lost you, but are you back? I am back. I don't know if you can hear me now. I'm sure you missed my best points, but, um, but I will just say rewind about 20 seconds. So, so the video, the testimony at trial was that the video involved CDP members making CDP signs in front of VP headquarters, wearing clothing that was symbolic of CDP. Now there was also testimony at trial, or pardon me, the video itself where the stills showed that Barry Gilton was not merely an extra in that video, but that there are closeups of Gilton as a featured member of the video. One rational view of that video, a reasonable inference someone could draw from that video is that this is a public declaration of allegiance to the gang that the video is celebrating. Now it's not the only inference that someone could draw. Someone could just say, well, it's just a music video and he's not in the gang and everyone else in the video happens to be either in the gang or a non-member associate, but, but it's not proven. And that's true. But under the Jackson standard, you know, we have to assume that any conflicts in the evidence went to the verdict and that all reasonable inferences are drawn in its favor. And here you have someone appearing in what is in essence, an allegiance video the year before the, the, the murder takes place. And so would that show that he is a member? Because I guess I didn't understand you to be really relying on a theory that he is a member of the gang. I don't think that it shows that he is a member, but I think that it shows that he is so closely connected to the gang that a jury, when he then commits murder with two gang members, a jury could infer that he wished to further facilitate the gang's endeavors. And I think that's reasonable for a few reasons. The first is that even if the inference is just for the limited amount of time after the murder, there, there are reasons in the record why Barry Gilton would have wanted CDP to continue its pattern of racketeering activity in order to provide him protection from reprisal and protection from detection. And that's as to reprisal there, there's obviously a lot of evidence about the victim of being in the block Cripps, a violent gang from LA that is itself engaged in shootings and reprisal murders. That's an excerpt of record 1406 to 07, but there's also evidence that Antonio Gilton is shot a few weeks after the murder outside of one of the gang's Now there isn't evidence in the record. I will concede that that shooting of Antonio Gilton was a reprisal for the Calvin Sneed murder. But I think again, a rational juror viewing all of this evidence in the light, most of the world, the government could certainly infer that Barry Gilton, who had attended reprisal funerals in the past, knew exactly what the risks he was undertaking were in engaging in a murder with CDP and intended that CDP continue its pattern of racketeering activity to protect him in the immediate aftermath of the murder. Well, he had this understanding at the time that the murder was committed. He had agreed at that point, he was part of an agreement to further the criminal enterprise. That's... That he entered into that agreement afterwards. So at the latest, Your Honor, the government's contention is that he entered into it at the time of the murder. I think that there are other possible conclusions that a rational juror could have come to, which is that he had entered into an agreement to further facilitate CDP prior to the murder and that the murder was a manifestation of that intent, that pre-existing intent. But I think at a minimum, when he engages in the murder with two gang members, he has formed an intent at that point to further and facilitate... I'm sorry, Your Honor. I didn't say anything. Oh, I thought you had a question. So I think at that point, he has formed the requisite intent to further and facilitate CDP as an ongoing endeavor. And I think the testimony in the record that CDP had a well-known code of silence, engaged in very open and notorious witness of intimidation, that's at Excerpture Record 530 and 765, gives some support to the notion that he also won't avoid detection and that CDP as an ongoing concern meant that his odds of avoiding detection were increased. So I think there are rational and reasonable instances that a juror could have drawn this record to suggest that Gilton had every intent to further and facilitate CDP, again, at least at the time of the murder and at least for the brief period of time afterwards before he's arrested. I guess, if I could jump in with one question. So I think you're right that the government did not need to prove that Barry Gilton himself was on board for committing multiple predicate acts. It's fine that he just agreed to commit this one. But I guess, just from the last argument, I'm still left with the troubling view that this was, for him at least, a one-off special favor. And yes, he did approach, I mean, Williams was, as I understand it, a longtime friend of his. I don't know that there's a sense that you approach Williams in his capacity as a leader of CDP. It's more like in his personal capacity, can you help me out? Not in your official capacity, but in your personal capacity, can you help me out? Because I've got this personal problem that I, according to your theory, I tried myself to handle and I was unsuccessful. So can you help me out? And then, you know, same thing with the family member. So, but then that's what I'm saying. I just, to me, it feels like a one-off request and not something, not evidence from which the jury could rationally infer that he had some stake in the ongoing success of the enterprise. From his standpoint, he doesn't care whether they continue to rob and kill people for stuff that doesn't relate to him. He just wants this one thing done. And once it's done, he's, his business with them is finished, it seems to me. That just strikes me as, I don't know, I guess I'm kind of in the same place I was in the last case. And I'd like to hear your attempt to dislodge me from that view of the evidence. Hopefully I'll do a better job on this. But let me just answer your honest question in a few points, which is, you know, the fact that he is personally motivated to have this murder happen and that he personally benefited from it. I think one view of that is, as your Honor articulated, which is he therefore wanted nothing to do with the gang afterwards. I think another view of that is that the pattern that the jury saw, starting with the conversation to buy jewelry, the video, and then the murder is someone who is staying quite close to the gang and trying to personally benefit, particularly with the jewelry discussion and the murder, personally benefit from the gang's racketeering activity. Now you could certainly one inference from that is, well, no, it's a one-off conversation as to the jewelry. It's a one-off murder with two gang members. A few years later, he appears in the video, not because he cares about CDP as a racketeering enterprise, but just because it's a music video. But it's my contention that that is not the only rational view of the evidence, that there are reasonable inferences that under the Jackson standard have to be drawn in favor of the verdict. And I think here where there's mixed motives, he could be acting purely for personal benefit, and it personally benefits him that CDP continue its ongoing enterprise because he's calling upon it to do him personal favors in your Honor's articulation. So, you know, he wants to invoke the gang's loyalty to his family to commit murder in order to avenge disrespect on his family. I think that speaks, it could speak that he just wants a one-off relationship with the gang. It could speak to a rational juror saying, this is someone who enjoyed the benefits of having a gang loyal to him and certainly want to control the gang's ongoing success as a result of that. I don't understand the benefits. The first benefit, of course, forget about the piece of jewelry. The first benefit and the principal benefit was the murder of Sneed, which he wanted for personal reasons and for revenge. And I don't see any subsequent personal benefit beyond that. I mean, you've conjured up that, well, he, you know, they might provide protection for him or they help him cover. But I don't see any intent to further their their criminal enterprise and allow them to commit other crimes. In fact, the evidence suggests that he was basically against violence and counseled people against it. You can correct me if I'm wrong. You know, it's a complicated record here. So Judge Corman, respectfully, I just have to disagree based on the standard of review on sufficiency challenges, which is, I think we can't ignore the armed robbery conversation. And in fact, I think we have to view it in the light, most favorable to the government. And I think we can't ignore the fact that he. Which armed robbery are you talking about? I'm sorry. The conversation he has where he's agreeing to purchase jewelry stolen in an armed robbery. I concede, as I pointed out to Judge Friedland, that there isn't direct evidence that he was aware that or he was informed by Charles Heard. I stole this piece of jewelry through armed robbery. But I think that there that that a rational juror could draw the conclusion that this was not Charles Heard just trying to sell bonafide obtained jewelry to Barry Gilton and Barry Gilton would have known that. I think that the subsequent murder, even if the murder is for personal reasons and he personally benefits, I think the fact that he has a gang at his beck and call to do what he failed to do in Los Angeles when he and Ms. Mercado tried to kill Calvin Sneed themselves, I think shows that he has every incentive that the gang continue its pattern of racketeering activity. It's something a gang at his beck and call is different from a couple of people or somebody who we knew doing a favor for him. Respectfully, Your Honor, I think the case law shows that in so many racketeering cases, the relationships are often quite complicated and mixed and often involve family members, longstanding personal relationships. And that makes sense. I mean, that's part of what binds the group together, not just the shared affinity for the shootings or the pattern of racketeering activity. But indeed, that there are these complicated and often mixed relationships that begin as personal or begin otherwise and grow to be personal. I mean, JB, the gang cooperator, testified to that. One final point on the Boys and Girls Club evidence, which Your Honor alluded to, where someone testified that Barry Gilton had counseled young people away from gang life. I would just say that I think that that evidence, if you view the evidence in the light most favorable of the government, I think is not consistent with anything that he's found guilty of. And that's because, first of all, someone can be hypocritical, which is they can counsel young people away from gang life while also participating in it. And indeed, the district court in this very case found that Gilton had committed the murder and found the murder to be an enterprise-related murder, and yet found that the Boys and Girls Club evidence meant that he could never have conspired with the racketeering enterprise, which I think is illogical. But beyond that, I also think that the gang evidence itself, pardon me, the Boys and Girls Club evidence itself was fairly weak and generic. I see I'm well over my time. I'm sorry, Your Honor. I'd love to have some rebuttal time, but I understand. Okay, no, we'll certainly give you a couple minutes for rebuttal. Let's hear from counsel for Mr. Gilton. Please record. Good morning, Your Honors. My name is Richard Tamora. I represent the defendant and appellant, Perry Gilton. He is watching today via Zoom. He's been gainfully employed since he was released from custody last year. He's got a great job, great benefits going forward. No police contacts whatsoever. Your Honors, there's no real disagreement about what factually happened in this case, but we do have a fundamental disagreement with the government about what the government has to prove by way of a pattern of racketeering activity and what rational inferences can be drawn by the evidence at trial. Reading the government's brief, it seems to me that they're asking this court to make new law in that they're asking the court to remove from the jury instructions and the case law that underlies them the requirement that the defendant agreed to an enterprise with knowledge and intent of at least two racketeering acts in this case. And since this court's review is de novo, I did want to stress several parts of the record that I believe informs the court's analysis. First, at excerpt of record 2363, the prosecutor below specifically told the court and argued to the jury at 2363 that their theory was, and I'll quote this, is that our argument to the jury is going to be that they can find Mr. Gilton, join the conspiracy for purposes of count one on and around May 2012. He says some other things. And then he says, it turns out he wasn't a member for very long because he was arrested on June 9th, but that's irrelevant under the law. So that's our theory. So they were proceeding in the trial court that he was a member. And the government's argument today is it's not that. It's that the court can find that based on just this one racketeering, quote unquote, racketeering act, they could find that he, that there was a second racketeering act as intent for a second racketeering act as required by the jury instruction. But counsel, you would agree, I think, that if, let's say, fellow, not fellow, that other CDP members approach Mr. Gilton and persuaded him to help them kill a rival gang member, kind of the core types of murders that CDP had been involved in before, even if Mr. Gilton had just been on the periphery the whole time, even if he participated in just this one act of murder, if he knew that it was part of this larger enterprise and that his one act of participation was going to further the enterprise, I think that's enough to become guilty of RICO conspiracy. You don't have to sign up for two predicate acts, right? Your Honor, I disagree. I think if it was just one act, there has to be evidence to show an intent for at least one other racketeering act. It could be anything. But can't the other act be by the enterprise? I mean, if you're actually having an intent and purpose to do one act to further the enterprise, then can't the enterprise other people do the Mr. Gilton formulated the intent to advance at least one racketeering act? And that evidence is lacking in this case. That's my point. It seems like we should focus on that, why this murder wasn't with a racketeering purpose, rather than thinking about why there wasn't a second thing. Yes, Your Honor, it wasn't for a racketeering purpose. And the last few pages of my brief address that point, the court has hit on it already. And that is, this case is a state court homicide case. It is about a father, is about a mother trying to protect their minor child who was being exploited, pimped by a gang member, and all that is attenuated. That's what this case is about. And when you're talking about the government takes these small portions of the record, namely, for example, the gold chain incident, which there is no evidence that Mr. Gilton knew about. They talk about JB knowing that he buried Gilton, knew that JB was armed at the time, but the evidence does not show that. What the evidence showed was that Barry Gilton, and Barry Gilton would tell him stay safe, stay out of trouble. But he never said anything about Barry Gilton knowing he was armed at that time. And so I guess my, and look, I've represented Barry Gilton for eight years. I was his trial counsel. And I've never, ever understood how this case became a federal case. I thought that when we tried the case- Can I interrupt? Can I interrupt for a second with a question about this? Sure. As I understand it, you haven't challenged the jury instructions as incorrect. You haven't said that there was evidence that shouldn't have been admitted because it was too inflammatory. So the jury did convict Enrico, and you haven't pointed to anything that they heard that they shouldn't have heard or the instruction was wrong. So how did the jury go wrong? Well, Your Honor, I'm the appellee, so I don't have to, you know, I wasn't arguing that there was error below. I'm arguing that the district court was correct. And it's- Yeah, I understand that. But we, it's hard for us to say the district court was correct in overturning a jury verdict. It's just hard to overturn a jury verdict when we don't have a good reason to. So I'd like to know what's your theory about how the jury thought there was RICO evidence, even though you say there wasn't. I don't know, Your Honor. I mean, there's a whole, I don't know that I have a legal argument about why they found what they found. I know that the jury was out for five days. The jury verdict came out on March 10th. And then three days after that, everybody was on lockdown in California. I don't know what was happening with them. If we had had more time, maybe they would have come out my way. I argued all of the things that I've argued in my briefs to the court about it. I don't know. I don't know what they could have gotten. I think all you need to do is point people back to those jury instructions. Nobody can understand what the hell it means, right? It's confusing. It's confusing for us as law people. I don't know how we expect juries to figure out that a RICO conspiracy, that is one of the most complicated things to try to explain to a jury. So that would be my explanation if I were you. It's just nobody knows what it means and people get confused. Well, I didn't want to admit to that, Your Honor. I spent hours and hours trying to figure them out. And I think that, I mean, realistically, what juries do is they kind of take a... Anyways, I don't know the answer. I think that the jury instructions were confusing. I think that they may have convicted based on the idea that if Mr. Gilton was guilty of the murder of Calvin Sneed, he was therefore guilty of count one. That's the only thing that I can point to. I think that that is not enough, though, for a racketeering conspiracy conviction. I did want to also point to the record also, Your Honors, that, and this will inform the court's de novo review, is that the government's star witness, JB, he was a member of the gang. He knew all of the members. He knew everyone who was involved. And he did crimes himself. And he knew who did the crimes. It's significant to note that he didn't say that Barry Gilton was a member. And to his credit, he didn't say that. He didn't say that Barry Gilton committed any crimes. And he didn't say he didn't help with any crimes. I mean, I think that, again, with the court's de novo review, the court can look at that and say, well, look, the government's star witness doesn't even place him in this community. And JB had a lot to say about other defendants in this case. And I think that that's another thing that the court can look at, is that the court should look at the degree and the type of evidence with respect to all the other defendants and then look to the evidence with respect to, well, the other defendants who were tried in the previous case. And that evidence came into our case as well. And then look at the de novo review in that sense. Of course. Your client was also acquitted of the Vicar murder. Yes. Yes. He was acquitted of the Vicar murder, Your Honor. Do you want me to say anything more about that? Or do you have a question? No. Okay. The last thing in terms of the case law, Your Honor, is I looked for a Ninth Circuit case law that would be instructive to this case. I didn't find any in the Ninth Circuit, I think probably because this type of situation doesn't come up very often at all. In most, at least my experience in racketeering cases, is that it's never really an issue whether or not there's a second racketeering act to which there is evidence that the defendant agreed to. It just doesn't happen. I did, however, find cases that were close out of the Eleventh Circuit, and I've cited those in my brief. That's United States v. Toe, 144F, 737-746. That was an Asian gang rico case. And the court basically said there that even if the defendant was a willing accomplice to a robbery, that fact alone would not prove that he agreed to the overall objective of supporting the enterprise. And I think that's the case here, is that while the evidence is a strong state court homicide case, there isn't enough evidence that a jury could find that there is a, that he was supporting the enterprise going forward. Why doesn't the music video show that he was promoting the gang? Well, I just wanted to let the court know that the video was never played. It was all stills. And there's been a lot of litigation about videos, at least in the trial court, about what they mean and what relevance they have. And what the court admitted them for was not for membership in the gang, but it was for, I forget the term that he used, but it was to show that there was a relationship between various people. I have a fundamental problem with the government using things like it as a, as a, somehow as a promotional materials. It's not promotional materials. It's a, it's a, it's just a, it's just a music video. It's the, that's what people do nowadays, you know, on the Instagram and all those, all those things. So the other case I wanted to point the court to which is 921 F second, 1542 to 43. That again is 11th circuit court. And it essentially says the same thing that participation in a racketeering act in and of itself is not enough to show going forward that, that the defendant agrees to the enterprise and it's a pattern of racketeering activity. Unless the court has any other questions. Okay. Very good. Let's put two minutes on the clock for rebuttal. Thank you. I'd like to start with one point where I agree with my friend and then a few points where we disagree. One is in response to judge Friedland's question, just the stills were admitted. I confirmed that in the interim, but three quick points I wanted to just respond to. The first is there are two new arguments that were just offered for the first time that are not in the brief. One is that the jury instructions were somehow confusing. There's no claim. There wasn't a claim below by Mr. Gilden. There's not a claim on appeal in his briefing that this is, there was a jury instruction error that led to well, just to be clear, your, your opponent didn't say that. I said that I'm just saying they are confusing. They might be I take your point, your honor. I just want to make it clear that that wasn't an issue that was yes. If you could pause it, see if he comes back. Correct. I think that we lost you again. Can you back up again? Yeah. Yes. I'm sorry, your honor. Can you hear me now? Yes. Okay. So my only point was that the video was properly considered by the jury. There was no claim below and there's no appeal that the video is somehow not to be, or the stills were not to be considered because they are expressive conduct or there's some kind of art fairly easily, which is to say that the jury acquitted Mr. Gilden and Ms. Mercado of conduct that required that they acted with a substantial purpose related to the gang, but it convicted Mr. Gilden of conduct that required he intended to further and facilitate the gang overall. And I think that that's not inconsistent. And as to Ms. Mercado, it just required that she knew of the actor's purpose, not that she the Vicar purpose. And I see I'm out of time. I would just explain why it's not inconsistent. Sure. So the, a Vicar murder would require that Mr. Gilden when he committed the murder of Calvin Sneed acted with a substantial purpose for his own position in the gang. And the jury may have found that the murder was committed purely for personal reasons for Gilden, or at least not for Barry Gilden. However, the evidence as a whole does support the fact that he intended to further and facilitate CDP overall, not just in that one murder act in his separate conduct with the gang and that the murder was actually the personal motive murder is actually consistent with his intent that the gang continue its pattern of racketeering activities, since he had just doing to further the gang, if it's not participating in this murder. Oh, no, I'm sorry, Your Honor, if I, I misstated it. I think the murder is very much conduct that the jury can consider as evidence of his intent to further and facilitate CDP. What I was differentiating is it's not required to find that when he commits the murder, his motivation is substantially to improve his rank within CDP. That's the Vicar Church that they acquitted him for the for the Rico conspiracy. That's not a requirement. And I think that's why the verdict is not inconsistent. Yes. Okay, very good. Thank you both for your helpful arguments in this case. Case just argued is submitted. And we are adjourned for the day. All rise.
judges: Courtroom 3, 3rd Floor Rm 307